UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DEAN SCOTT,

        Plaintiff,

   v.

CITY OF YUBA CITY,
DEPARTMENT OF PUBLIC WORKS,
and DOES 1 through 50,
inclusive,

        Defendants.

_____/

NO. CIV. S-08-873 LKK/GGH

O R D E R

    Plaintiff Dean Scott has brought a complaint against his former employer, defendant Yuba City, alleging various disability discrimination claims under the Rehabilitation Act, the Americans with Disabilities Act, and California's Fair Employment and Housing Act, as well violation of California Labor Code section 227. Pending before the court is defendant's motion for summary judgment. The court resolves the matter upon the parties' papers and after oral argument. For the reasons stated below, the motion is granted.

1

# I.  BACKGROUND

Plaintiff was employed as a probationary Maintenance Worker I by the City of Yuba City Department of Public Works.  He maintains that when the city employees learned of his diabetes, they discriminated against him by filing false performance reviews, a false statement of his job's responsibilities, and ultimately terminating him.  The City maintains that plaintiff was terminated for his poor performance and for his failure to acquire a commercial driver's license, one of the stated requirements of the job.  Plaintiff's diabetes inhibited, at the least, his ability to secure such a license, and plaintiff did not acquire a CDL.  Nonetheless, plaintiff has not argued that the CDL requirement is itself discriminatory.

As background, the court reviews the regulations concerning diabetics and commercial drivers' licenses, the City's requirements for the Maintenance Worker I position, and the history of plaintiff's employment with the city.

**A.   Commercial Driver's Licenses**

The federal Department of Transportation imposes various standards on the operation of certain commercial vehicles, 49 U.S.C. § 31132(1)(A), which include certain health standards for operators of commercial vehicles.  49 C.F.R. § 391.41.  One such standard is that the driver have "no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control."  § 391.41(b)(3).  The Department of Transportation has stated in a guidance document that "[i]n the

1   case of . . . insulin-using diabetes . . . the current standards
2   are absolute, providing no discretion to the medical examiner" to
3   permit a waiver.  Regulatory Guidance for the Federal Motor Carrier
4   Safety Regulations, 62 Fed. Reg. 16370, 16411 (Dep't of Transp.
5   April 4, 1997).  See also Cal. Dep't of Motor Veh. Form DL 51 (Rev.
6   Oct. 2009) (reprinting federal Dep't of Transp. opinion that "a
7   diabetic who uses insulin for control does not meet the physical
8   requirements" for operation of commercial vehicles), available at
9   http://www.dmv.ca.gov/forms/dl/dl51.pdf

10      California has adopted the federal requirements for
11  "commercial driver licenses" issued by the state.  Cal. Code Regs.
12  tit. 13, § 28.18(a), see also Cal. Veh. Code §§ 12806(c), 15200.
13  However, the California Vehicle Code provides that "[a] physical
14  defect of the applicant that, in the opinion of the department [of
15  motor vehicles], is compensated for to ensure safe driving ability,
16  shall not prevent the issuance of a license to the applicant."
17  Cal. Veh. Code § 12804.9(a)(3).  More generally, an applicant for
18  a CDL must submit "medical examination report," wherein a qualified
19  medical examiner with knowledge of the applicant's driving duties
20  determines whether the applicant satisfies the standards expressed
21  in 49 C.F.R. § 391.41.  Cal. Dep't of Motor Vehicles Form DL51. It
22  appears that the power to waive requirements includes the power to
23  waive the prohibition on insulin-dependant drivers in very limited
24  circumstances, but the parties have not provided any authority or
25  argument on this issue.  On defendant's motion for summary
26  judgment, all ambiguities must be construed in the light most

3

1  favorable to plaintiff, and the court therefore assumes for

2  purposes of this motion that such a waiver is available.

3  **B.   Maintenance Worker I**

4       The City of Yuba City has roughly 24 "Public Works'

5  Maintenance Worker" employees, including part time and full time

6  employees.  Def.'s SUF 4.  Employees are assigned to either

7  Water/Sewer or Street crews, but all employees cover for "on call"

8  duties for both groups and are subject to reassignment.  Def.'s

9  Statement of Undisputed Facts ("Def.'s SUF") 5-6, 24.[1]

10 Accordingly, Maintenance Worker employees are trained in both

11 crews' duties.

12      Maintenance Worker I ("MWI") employees perform a variety of

13 tasks.  At times relevant to this suit, defendant's advertisements

14 for the position listed fifteen types of potential duties.

15 Declaration of Langley, Ex. A; see also Pl.'s Additional Material

16 Fact 63.  Of these fifteen categories, three require a commercial

17 driver license ("CDL"), in that they include operation of vehicles

18 weighing over 10,000 pounds (including some vehicles weighing over

19 26,000 pounds).  These duties, as described by the advertisement,

20 are "Uses, cleans, and maintains power equipment, tools, and

21 vehicles required for the work," "May operate dump truck and front

22 end loader to remove and replace excavated material," and "May be

23 required to operate specialized vehicles and power equipment, such

24 as a backhoe and street sweeper."  As discussed in the analysis

25 ────────────────

26      [1] Facts cited to defendant's statement of undisputed facts are
   in pertinent part undisputed.

1  section below, the parties dispute how often MWIs perform these
2  tasks.

3      New Maintenance Worker employees undergo a probationary period
4  of twenty six pay periods.  Def.'s SUF 14; Declaration of Susan
5  Pearson, Ex. B.  A probationary employee may be terminated if he
6  receives less than a satisfactory performance evaluation in this
7  period.  Def.'s SUF 45.

8      As expressed in the announcement, defendant's policy was that
9  MWIs must acquire a CDL within six months of the date of hire.  On
10 several prior occasions, defendant had extended this deadline for
11 employees "if and only when they ha[d] completed all of their
12 written tests with the DMV and ha[d] passed all of their
13 endorsement written tests, and passed" and the DMV was unable to
14 schedule a driving test date prior to the expiration of the six
15 month period on account of the volume of driving tests.  Deposition
16 of Mike Healy, 21-22.

17     New MWI hires undergo on the job training in three rotations
18 that ordinarily each last three to six months.  Def.'s SUF 9.  In
19 sequence, these are the water, meter, and sewer crews.  Def.'s SUF
20 10-12.  The sewer crew rotation requires employees to learn to
21 operate a "sewer jet," for which a CDL is required.  Def.'s SUF 13.

22 **C.   Plaintiff's Employment with The City**

23     Plaintiff was hired on April 3, 2006.  Plaintiff was first
24 assigned to pipe repair and water installations rotation.  Def.'s
25 SUF 36.  At the end of this three-month rotation, plaintiff's
26 supervisor evaluated plaintiff's overall performance as

1  "satisfactory."  Def.'s SUF 37-38, Pls.'s Response to Def.'s SUF

2  39.   Plaintiff was then assigned to a meter crew, where he was

3  supervised by Matt Langley.  Def.'s SUF 40-41.

4      On October 4th, six months and one day after plaintiff was

5  hired, plaintiff presented Langley with a "Job Characteristics"

6  form to be completed by a supervisor as part of plaintiff's CDL

7  application process.[2]  Def.'s SUF 27.   When plaintiff presented

8  this form to Langley, Langley learned that plaintiff was diabetic.

9  See Langley Depo. 121:8-15, Ex. 17.   Langley refused to sign the

10 form, stating that he had not seen one before.   Def.'s SUF 28.[3]

11 The following day, October 5th, plaintiff approached Mike Healy,

12 superintendent of the public works division and Langley's

13 supervisor, about the form.   Def.'s SUF 29-30.   Healy sought

14 assistance from human resources personnel and possibly also from

15 an employee of the city's insurance carrier.  With this assistance,

16 Healy completed the form and returned it to plaintiff that day.

17 Def.'s SUF 31, 33, 35; Healy Depo. 37-41, 178-79.  On the form,

18 Healy stated that MWI employees may be required to operate vehicles

19 weighing over 26,000 pounds for twelve hours a day.  Healy Depo.

20 Ex. 1. Healy later conceded, however, that in coming to this twelve

21

22      [2] As noted above, the parties have provided little background
   on the CDL application process.  As a result, the precise nature
23 of this form is unclear.   This uncertainty appears not to be
   pertinent to the court's resolution of this motion.

24      [3] Plaintiff objects to this fact, arguing that Langley "told
   Plaintiff he would not fill the form out because he feared
25 liability."  Plaintiff cites to the allegations in the complaint,
   and not to any evidence, in purported support of this objection.
26 The allegations in the complaint cannot create a factual dispute.

1  hour estimate, he considered commercial vehicles generally, rather

2  than specifically considering vehicles weighing over 26,000 pounds.

3  Healy Depo. 60-61.[4]

4        Also on October 5th, Langley presented to plaintiff the first

5  page of an evaluation of plaintiff's performance on the meter crew.

6  Scott Decl. ¶¶ 16, 18, Healy Depo. Ex. 4 (copy of this evaluation).

7  At that time Langley did not show plaintiff the evaluation's three

8  additional pages.  Although defendant contends that this evaluation

9  had been completed at an earlier date, plaintiff correctly argues

10 that because this form was not tendered until October 5th, a jury

11 could conclude that it was not completed until that time.

12       Plaintiff and Langley met to discuss the evaluation on Monday,

13 October 9th, at which time Langley presented the entire evaluation

14 to plaintiff.  Scott Decl. ¶ 18.   Langley's evaluation provided

15 an overall rating of "satisfactory."  The evaluation nonetheless

16 noted comments in several areas where improvement was needed.

17 Langley wrote, among other things, that plaintiff "need[ed] to

18 focus on getting jobs completed and not being confrontational with

19 public or co-workers" and "require[d] more than the usual

20 assistance . . . and needs to excel in customer service."  Healy

21 Depo. Ex. 4.  Plaintiff requested examples of specific behavior

22

23       [4] Neither party has directed the court to evidence regarding
    how often MWI employees actually operate vehicles weighing in
    excess of 26,000 pounds.

24       Plaintiff contends that in completing the form, Healy was also
    incorrect in stating that MWI employees "often" operate vehicles

25 of various weights.  As explained in the discussion of "essential
    functions" below, plaintiff has failed to raise a triable question

26 as to this issue.

1   warranting these criticisms, but Langley refused to provide any.
2   Scott Decl. ¶¶ 16, 18, 23.  Plaintiff took the evaluation home to
3   examine it more closely, and made a plan with Langley to meet and
4   further discuss the evaluation on October 12th.  Id.  At that
5   meeting, Langley granted plaintiff's request for additional time
6   to prepare a response to the evaluation.  Langley Decl. ¶ 20.

7        October 12th was the first time plaintiff complained of
8   discrimination.  At the conclusion of the October 12th meeting with
9   Langley, while Langley was out of the room, Healy walked by.
10  Plaintiff told Healy that plaintiff believed he was being unfairly
11  criticized and targeted for discrimination on account of his
12  diabetes.  Scott Decl. ¶ 25.  Healy responded that plaintiff was
13  "barking up the wrong tree."  Id. ¶ 26.  Also on October 12,
14  plaintiff submitted a memo to the City Manager and Human Resources
15  Director, in which plaintiff contended that he was being
16  discriminated against on account of his diabetes.  Def.'s SUF 88-
17  90.  Specifically, he contended that negative evaluation and the
18  initial refusal to complete the job characteristics form
19  constituted discrimination.  Scott Depo. Ex. D (copy of this
20  memo).[5]  As a result of this complaint, Odeana Chisum, a Human
21  Resource Analyst employed by the City, conducted an investigation.
22  Chisum Depo. 39-40.  During this investigation, Healy informed
23  Chisum that Healy did not feel that plaintiff "was performing . .

24  _____

25       [5] This memo also contested denial of a raise. Scott Depo. Ex.
26  D.  In this suit, plaintiff has not argued that this denial was
    discriminatory.

8

1  . in a manner that would merit his retention." Id. at 45.

2    On October 24, plaintiff attended a meeting with Langley,

3  Healy, Mike Fitzgerald (the maintenance worker street crew

4  supervisor) and Ken Reische (plaintiff's union representative).

5  Def.'s SUF 58.  Plaintiff became agitated at this meeting, as

6  demonstrated by his raised voice, body language, and defensiveness.

7  Def.'s SUF 59-60, 63-64.[6]

8    On November 13, 2006, plaintiff received a "Notice of

9  Occurrence" ("NOU") prepared by Langley.  Def.'s SUF 65.

10  Ordinarily, a NOU is a job performance counseling record that is

11  kept in the supervisor's file until the employee's next performance

12  evaluation.  Def.'s SUF 67.  At that evaluation, if the employee

13  has not engaged in similar conduct, the NOU is discarded, and may

14  not be mentioned in the performance evaluation.  Def.'s SUF 68-69.

15  Langley states that he issued the November 13th NOU because "[a]

16  customer had gone to City Hall claiming that Mr. Scott had offered

17  her a discount for an interruption in water service while he

18  _____

19    [6] For purposes of this motion, the court credits plaintiff's
   declaration that at this meeting, he did not use obscenities, call
20  anyone a liar, or tell Healy that if he needed to speak to
   plaintiff about his job performance Healy could speak directly to
21  plaintiff's (unidentified) lawyer.  Scott Decl. ¶¶ 28, 30, 31.
   Because the court must credit plaintiff's evidence that these
22  acts did not occur, the court must also reject Healy, Langley and
   Fitzgerald's characterization of these acts as offensive,
23  aggressive, and insubordinate.  Healy Depo 96-98, 148; Def.'s SUF
   64.  Defendant has not called the court's attention to evidence
24  indicating that the supervisors considered plaintiff's other
   conduct at the meeting, as described above, as aggressive,
25  insubordinate, or offensive.
     Plaintiff does not dispute that he raised his voice and was
26  agitated and defensive at the October 24th meeting.

changed out the water meter." Langley Decl. ¶ 22.[7] Plaintiff argues that contrary to Langley's assertion, plaintiff had not offered any such discount and did not even speak with the customer at issue. Scott Decl. ¶ 31. Plaintiff further provides the declaration of Beverly Foss, whom plaintiff contends was the customer at issue. Foss came to Yuba City Hall in October 2006 to complain about a water bill and seek a discount. She states that was never offered a discount by any employee, that she did not represent that she was offered such a discount, and that her complaint concerned a leak, rather than a service interruption. Declaration of Beverly Foss ¶¶ 1-7.[8] Although defendant raises several valid concerns regarding the credibility and weight of this evidence, plaintiff has raised a triable question as to whether the NOU was warranted.

When the November 13 NOU was issued, plaintiff was called in to discuss it with supervisors Langley and Fitzgerald. Def.'s SUF 72. At this meeting, plaintiff again became agitated and used "offensive body language." Langley Decl. ¶ 23; <u>see also</u> Fitzgerald Decl ¶ 9.[9]

---

[7] The November 13 NOU states "Talked to [plaintiff] about telling customers that they will receive discounts because we are changing out meters[.] No discounts are given in the field[.] Any leaks city problems [sic] should have a note made on work order and a call to finance for verification." Langley Decl. Ex. C.

[8] Plaintiff also cites an email sent by a City HR employee in December of 2007, attached as Gavin Decl. Ex. J. This email does not call Langley's version of events into question.

[9] Plaintiff attempts to dispute this fact by stating that these declarations contradict Langley and Fitzgerald's

10

1      On November 15, Healy recommended termination of plaintiff's

2 still-probationary employment.  Def.'s SUF 81.  Healy stated that

3 plaintiff "ha[d] not demonstrated a level of job performance

4 proficiency to consider [sic] retention as a full-time employee."

5 Gavin Decl. Ex. K.  Healy testified in deposition that in making

6 this recommendation, he considered plaintiff's aggressive behavior,

7 poor, attitude, and insubordination, as demonstrated by plaintiff's

8 conduct in the above meetings, as well as an incident in which

9 plaintiff "aggressively threw a shovel into the back of a truck,"

10 and plaintiff's failure to cure the deficiencies identified in the

11 previous performance evaluation.  Def.'s SUF 82.  No evidence

12 indicates that Healy considered plaintiff's failure to acquire a

13 CDL in making this recommendation.

14      Before taking effect, Healy's recommendation required approval

15 of the department head, the human resources director, and the city

16 manager.  Gavin Decl. Ex. K.  Steve Johnson, the human resources

17 director at the time, testified that he approved the recommendation

18 based on plaintiff's "poor performance and his failure to obtain

19 a CDL."  Deposition of Steve Johnson, 20:19-23.  Johnson stated

20 that he did not know whether plaintiff was capable of obtaining a

21 CDL, but that Johnson knew that plaintiff had not obtained it.  Id.

22 

_____

23 contemporaneous written accounts, because those accounts do not
mention use of the phrase "fucking liar."  The cited accounts
24 concern the October 24 meeting, rather than the November 13
meeting, and in any event, no witness contends that the phrase
25 "fucking liar" was used at the November 13 meeting.  Plaintiff has
not created a dispute as to whether he was agitated and aggressive
26 at this meeting.

at 116:14-117:3.   On this basis, defendant contends that the decision to terminate plaintiff was motivated in part by the failure to obtain a CDL.

On November 21, 2006, Langley issued a second NOU to plaintiff.   Def.'s SUF 76.   This NOU was for conduct on the previous day, namely, failing to follow instructions with respect to notifying a beauty salon owner that there would be an interruption of their water service resulting in a complaint from the salon owner to the City. Def.'s SUF 77. Plaintiff claims that the NOU was unjustified because he had instructed two junior employees to inform the customer that the water would be shut off, and that he believed that they did so. Scott Depo 123-125. At the meeting to discuss the NOU, plaintiff again became agitated. Langley Decl. ¶ 25.

On November 27, plaintiff was informed that he was terminated on account of his performance.   Def.'s SUF 84.

The California Department of Motor Vehicles ultimately denied plaintiff's application for a CDL.   On November 23, 2006, his application was denied "due to a Federally disqualifying medical condition of insulin dependent Diabetes" under section 391.41(b)(3) of the Federal Motor Carrier Regulations.   Angelo Decl. Ex. C. Plaintiff's appeal of this denial was heard on November 28, 2006, the day after plaintiff was informed of his termination.   Id.   On appeal, the denial was affirmed.   The notice of findings and decision concerning the appeal explained that insulin dependent diabetes is a disqualifying medical condition under 49 C.F.R.

12

section 391.41, and that while plaintiff had attempted to manage his diabetes with an insulin pump, he did not "demonstrate a clear understanding of the insulin pump and [its] intricacies" and he had been on the pump "a relatively short period of time." Angelo Decl. Ex. C. No admissible evidence supports plaintiff's contention that his application was denied because he had been terminated by the city.[10]  The notice of decision states that hearing officer considered plaintiff to be "on leave," such that plaintiff sought a restricted license "in order to be able to remain employed at the Yuba City Public Works Dept." Id.

## II. STANDARD FOR A FED. R. CIV. P. 56 MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

> Under summary judgment practice, the moving party [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to

---

[10]  Plaintiff declares that during the hearing, the hearing officer denied the application because, without current employment, there was no job characteristics form on which to base the application for a diabetes waiver/exemption, so there was no way for plaintiff to obtain a CDL. Scott Decl. ¶¶ 38-39. This evidence is hearsay not within any exception.

13

> interrogatories, and admissions on file,
> together with the affidavits, if any," which
> it believes demonstrate the absence of a
> genuine issue of material fact.

_Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  _Id_.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  _Id_. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  _Id_.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  _Id_. at 323.

     If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 586 (1986); _First Nat'l Bank of Arizona v. Cities Serv. Co._, 391 U.S. 253, 288-89 (1968); _Ruffin v. County of Los Angeles_, 607 F.2d 1276, 1280 (9th Cir. 1979), _cert. denied_, 455 U.S. 951 (1980).

     In attempting to establish the existence of this factual

14

dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 242 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

     In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405

1   (9th Cir. 1985).

2        In resolving the summary judgment motion, the court examines

3   the pleadings, depositions, answers to interrogatories, and

4   admissions on file, together with the affidavits, if any.   Rule

5   56(c); <u>Poller</u>, 368 U.S. at 468; <u>SEC v. Seaboard Corp.</u>, 677 F.2d

6   1301, 1305-06 (9th Cir. 1982).   The evidence of the opposing party

7   is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable

8   inferences that may be drawn from the facts placed before the court

9   must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S.

10  at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655

11  (1962) (per curiam)); <u>Abramson v. University of Hawaii</u>, 594 F.2d

12  202, 208 (9th Cir. 1979).   Nevertheless, inferences are not drawn

13  out of the air, and it is the opposing party's obligation to

14  produce a factual predicate from which the inference may be drawn.

15  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D.

16  Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

17       Finally, to demonstrate a genuine issue, the opposing party

18  "must do more than simply show that there is some metaphysical

19  doubt as to the material facts. . . . Where the record taken as a

20  whole could not lead a rational trier of fact to find for the

21  nonmoving party, there is no 'genuine issue for trial.'"

22  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

23                         **III. ANALYSIS**

24       Plaintiff's complaint enumerates eight claims. Plaintiff does

25  not oppose defendant's motion as to the California Labor Code

26  claim. At issue are plaintiff's claims for discrimination, failure

16

to accommodate, failure to initiate the interactive process, retaliation, and harassment.

**A.   Plaintiff's "Discrimination" Claims**

Plaintiff's first two claims allege discrimination under the Americans with Disabilities Act ("ADA") and California's Fair Employment and Housing Act.  These claims allege that defendant intentionally discriminated against plaintiff by subjecting him to unfavorable reviews, termination, and other adverse conduct immediately after learning that plaintiff was diabetic.  See Pl.'s Opp'n, 1; FAC ¶¶ 62.

**1.   Plaintiff Does Not Bring a "Disparate Impact" Claim**

The Supreme Court has repeatedly recognized a distinction between disparate treatment and disparate impact theories of discrimination.

> Liability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision. By contrast, disparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Under a disparate-impact theory of discrimination, a facially neutral employment practice may be deemed illegally discriminatory without evidence of the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case.

Raytheon Co. v. Hernandez, 540 U.S. 44, 52-53 (2003).  When a plaintiff pleads and proceeds solely on a disparate treatment theory, a plaintiff may not "proceed on a disparate impact theory at the summary judgment stage."  Coleman v. Quaker Oats Co., 232

1   F.3d 1271, 1294 (9th Cir. 2000).

2       In this case, although plaintiff's third and fourth claims

3   allege that defendant should have allowed plaintiff extra time in

4   which to acquire a CDL, nothing in the complaint indicates that

5   plaintiff contends that policy of requiring Maintenance Worker I

6   employees to ultimately acquire a CDL was itself discriminatory,

7   whether on a disparate impact theory or otherwise.

8       **2.   The Elements of Plaintiff's ADA and FEHA Discrimination**

9            **Claims Are The Same**

10      "The ADA prohibits employers from 'discriminat[ing] against

11  a qualified individual with a disability.'"  Rohr v. Salt River

12  Project Agric. Improvement & Power Dist., 555 F.3d 850, 858 (9th

13  Cir. 2009) (quoting 42 U.S.C. § 12112(a)).  California courts have

14  held that FEHA on this issue is parallel to ADA.  Quinn v. City of

15  Los Angeles, 84 Cal. App. 4th 472 (2000).  Like the ADA, a FEHA

16  plaintiff must be a "qualified individual." Id.; see Cal. Gov. Code

17  § 12940(a)(1) (FEHA does not prohibit an employer from refusing to

18  hire or terminating an employee who, because of disability, "is

19  unable to perform his or her essential duties even with reasonable

20  accommodations.").  Under both statutes, plaintiff bears the burden

21  of demonstrating that he was qualified.  Rohr, 555 F.3d at 862;

22  Quinn, 84 Cal. App. 4th at 480.  For the reasons stated below,

23  plaintiff has failed to meet this burden.[11]

24  ────────────

25       [11] The parties argue that the question of qualification should
    be decided within a byzantine framework of multi-step tests.
26  Specifically, the first step of the McDonnell Douglas framework
    requires plaintiff to show a prima facie case of discrimination.

### 3.   Was Plaintiff  A "Qualified Individual"

In a recent en banc opinion, the Ninth Circuit summarized what it means to be a qualified individual under the ADA.

> Qualification for a position is a two-step inquiry.  The court first examines whether the individual satisfies the "requisite skill, experience, education and other job-related requirements" of the position. The court then considers whether the individual "can perform the essential functions of such position" with or without a reasonable accommodation.

Bates v. UPS, 511 F.3d 974, 990 (9th Cir. 2007) (en banc) (quoting 29 C.F.R. § 1630.2(m) and 42 U.S.C. § 12111(8)).  Defendant argues that plaintiff fails both of these steps, because possession of a commercial driver's license is a "job-related requirement[]," and because operation of vehicles requiring such a license is an essential function of the job.

In this case, the distinction between the first and second of these steps is unclear, as is the relationship between these steps and an employer's ability to impose "qualification standards."  On facts similar to those here, Bates held that the first step was not

---

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  In disability cases, the second element of this first step is that plaintiff is qualified. Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004), Snead v. Metropolitan Prop. & Cas. Ins. Co., 237 F.3d 1080, 1087 (9th Cir. 2001), Deschene v. Pinole Point Steel Co., 76 Cal. App. 4th 33, 44 (1999).  On the facts of this particular case, these tests and frameworks do not modify the burdens or standards of proof as it pertains to qualification. Accordingly, although the court applies these frameworks, the court need not structure the analysis around them.  See also Rohr, 555 F.3d at 862 (discussing whether plaintiff had raised a triable question as to whether he was a "qualified individual" without reference to McDonnell Douglas's burden shifting framework or the elements of a prima facie case).

at issue. <u>Bates</u> concerned a hearing standard initially promulgated by the Department of Transportation. <u>Id.</u> at 981. While DOT imposed this standard only on operators of heavy vehicles, defendant United Parcel Service required drivers of all delivery vehicles, regardless of weight, to meet it. <u>Id.</u> The Ninth Circuit did not treat the hearing standard as a "job requirement" under the first step. <u>Id.</u> at 990. Because defendant here does not otherwise argue that plaintiff lacked the skill, experience, or education necessary for the job, the court turns to essential functions, following the approach used in <u>Bates</u>. Similarly, because a "qualification standard" must relate to the job's essential functions, the court turns to the essential function inquiry.

On the second step, the employer bears the "burden of production . . . to come forward with evidence of [the] essential functions." <u>Bates</u>, 511 F.3d at 991. Determination of essential functions is a question of fact. <u>Id.</u> at 991 n.7. Once these functions have been identified, the plaintiff bears the burden of showing that he can perform them, either with or without accommodation. 42 U.S.C. § 12111(8).

"'Essential functions' are 'fundamental job duties of the employment position . . . not includ[ing] the marginal functions of the position.'" <u>Bates</u>, 511 F.3d at 989 (quoting 29 C.F.R. § 1630.2(n)(1)). A job function may be essential where "the reason the position exists is to perform that function," where there are a "limited number of employees available among whom the performance of that job function can be distributed," where "[t]he function

20

1  [is] highly specialized so that the incumbent in the position is
2  hired for his or her expertise or ability to perform the particular
3  function," or for other reasons.  29 C.F.R. § 1630.2(n)(2)(i)-
4  (iii).   As  evidence  of  which  functions  are  essential,
5  "consideration shall be given to the employer's judgment . . . ,
6  and if an employer has prepared a written description before
7  advertising  or  interviewing  applicants  for  the  job,  this
8  description shall be considered evidence of the essential functions
9  of the job." 42 U.S.C. § 12111(8).  Other evidence may include
10 "[t]he amount of time spent on the job performing the function,"
11 "[t]he consequences of not requiring the [employee] to perform the
12 function," "[t]he work experience of past [employees] in the job,"
13 and "[t]he current work experience of [employees] in similar jobs."
14 29 C.F.R. § 1630.2(n)(3)(iii), (iv), (vi), (vii).

15     Defendant argues that there were two essential functions that
16 plaintiff was unable to perform: operation of a vehicle requiring
17 a commercial driver's license, and getting along with superiors,
18 coworkers, and the public.  Because the court concludes operation
19 of vehicles requiring a CDL was an essential function that
20 plaintiff was unable to perform, the court does not address
21 defendant's second purported essential function.

22          a.  **The "Essential Function" of Operating Vehicles**
23              **Requiring a CDL**

24     The job description for the MWI position stated that all
25 employees were required to obtain a CDL, and that the employee
26 duties could include operation of equipment requiring a CDL.

1   Def.'s SUF 2, 7-8.  Notably, the sewer maintenance aspects of the

2   job require use of a "sewer jet," and other aspects of the job

3   require use of a street sweeper, both of which can only be operated

4   by a person with a CDL.  Defendant provides numerous declarations

5   to the effect that "Maintenance Workers perform job tasks that

6   require a CDL daily," although none of these declarations

7   distinguish between the tasks performed by the Maintenance Worker

8   I, II, and III positions.  Declaration of Michael Healy ¶ 7; see

9   also Def.'s SUF 8.  Defendant also notes that if plaintiff was

10  prevented from performing the full range of duties, he would be

11  unable to be on call.  Def.'s SUF 24.

12      Plaintiff offers three arguments as to why operation of heavy

13  machinery was not an essential function.  First, plaintiff argues

14  that in his own experience, he was not required to operate any

15  machinery for which a CDL was required, notwithstanding the fact

16  that plaintiff was employed for seven months and that he covered

17  some call positions.  However, it is undisputed that plaintiff was

18  a probationary employee who had not completed a third of his

19  training.  Plaintiff has not provided any evidence indicating that

20  his experience was typical of fully-trained, non-probationary

21  employees doing the job plaintiff was hired to do.

22      Second, plaintiff notes that of the fifteen types of duties

23  included in the published job description, only three required a

24  CDL, and two of those three, unlike the other thirteen duties on

25  the list, are duties that "may" be performed.  Moreover, the

26  advertised description of the Maintenance Worker III position omits

22

1  the qualifying "may" from these duties.  Plaintiff argues that the

2  City's selective use of "may" is purposeful, and indicates that

3  MWIs do not necessarily engage in these activities, and that for

4  those that do, these functions occupy little of the employee's

5  time.  Even assuming that, contrary to defendant's evidence, MWIs

6  rarely perform these functions, defendant has provided evidence

7  indicating that it is essential that MWIs be *able* to do so, in

8  light of the limited number of employees available, the specialized

9  nature of the function, and the importance of being able to do so

10 when on call.  Plaintiff has not provided any evidence (other than

11 his statement of his own job duties as a probationary employee)

12 disputing this issue.

13     Third, plaintiff argues that operation of machinery requiring

14 a CDL is not essential because these duties could be reassigned to

15 other employees.  However, the evidence indicates that because of

16 the limited number of employees and the need to have employees on

17 call, such reassignment was not feasible.  Operation of machinery

18 requiring a CDL was therefore an essential function of the

19 position.

20          **b.   The "Reasonable Accommodation" of Extending Time to**

21               **Acquire a CDL**

22     The court therefore turns to whether plaintiff could perform

23 this function.  Plaintiff argues that he could have done so if he

24 had been granted the reasonable accommodation of an extension of

25 ////

26 ////

23

1  time in which to acquire a CDL.[12]  No evidence indicates, however,

2  that plaintiff would have been able to secure a CDL had an

3  extension been granted.  Plaintiff's application was denied on

4  November 23, 2006, and this denial was affirmed on appeal in a

5  notice of findings and decision issued on December 26, 2006.

6  Angelo Decl. Ex. C.  Plaintiff contends that his application was

7  denied because of misstatements in the job description form and

8  because, at the time the appeal was heard, plaintiff had been

9  terminated.  As discussed above, the only possible misstatement on

10  the job characteristics form concerned the amount of time spent

11  operating vehicles weighing over 26,000 pounds, and nothing

12  indicates that this fact influenced the licensing decision.

13  Similarly, no admissible evidence indicates that the hearing

14  officer relied on the fact that plaintiff had been terminated.

15  Instead, plaintiff's application was denied because insulin

16  dependent diabetes is a federally disqualifying medical condition.

17  The hearing officer's decision, although less than perfectly clear,

18  demonstrates that the officer either held that this regulation

19  could not be waived, or that waiver was inappropriate here, because

20  _____

21      [12] Plaintiff repackages his argument that operation of this
   machinery is not an essential function, claiming that a 'reasonable
22  accommodation' would have been to reassign duties requiring a CDL
   to other employees.  Once it is determined that a duty is an
23  essential function, reassigning that duty to another employee is
   not a reasonable accommodation.  Dark, 451 F.3d at 1089; c.f.  29
24  C.F.R. Part 1630, App. ("An employer or other covered entity may
   restructure a job by reallocating or redistributing nonessential,
25  marginal job functions.").  See also Mulloy v. Acushnet Co., 460
   F.3d 141, 153 (1st Cir. 2006), Hammel v. Eau Galle Cheese Factory,
26  407 F.3d 852, 867 (7th Cir. 2005).

1   while plaintiff had attempted to manage his diabetes with an

2   insulin pump, he had been on the pump "a relatively short period

3   of time" and did not "demonstrate a clear understanding of the

4   insulin pump and [its] intricacies." Id.  Thus, plaintiff has

5   failed to present evidence that would enable a trier of fact to

6   conclude that if plaintiff had been granted an extension of time

7   such that his appeal was heard prior to termination, he could have

8   succeeded in obtaining a CDL.[13]

9          c.   The "Reasonable Accommodation" of Assigning

10              Plaintiff to a Different Job

11      Finally, plaintiff argues that he "is a qualified individual

12  under the ADA if he can 'perform the essential functions of a

13  reassignment position, with or without reasonable accommodation,

14  even if [he] cannot perform the essential functions of the current

15  position.'" Dark v. Curry County, 451 F.3d 1078, 1089 (9th Cir.

16  _____

17      [13] Plaintiff has not argued that he should have been offered
    an extension of time that would have enabled him to develop a
    clearer understanding of his insulin pump.

18      Defendant alternatively argues that plaintiff's need for an
    extension, if any, arose from plaintiff's voluntary four month

19  delay rather than from plaintiff's disability. Wood v. Crown
    Redi-Mix, Inc., 339 F.3d 682, 687 (8th Cir. 2003) (citing Felix v.

20  New York City Transit Authority, 324 F.3d 102 (2d Cir. 2003))
    ("there must be a causal connection between the major life activity

21  that is limited and the accommodation sought," such that "[w]here
    the reasonable accommodation requested is unrelated to the

22  limitation, we do not believe an ADA action may lie."); see also
    Scotch v. Art Institute of California-Orange County, Inc., 173 Cal.

23  App. 4th 986, 1012 (2009).  Here, apparently unlike in Wood, there
    is a causal connection between the accommodation and the

24  disability, in that diabetes imposed additional steps on the CDL
    application process.  Because the court decides the reasonable

25  accommodation issue on other grounds, the court need not decide
    whether an accommodation can be reasonable if the employee's need

26  for it is only partially attributable to disability.

1  2006) (quoting Hutton v. Elf Atochem N. Am., 273 F.3d 884, 892 (9th

2  Cir. 2001)).  However, the plaintiff bears the burden of showing

3  that such a position was available.  Baert v. Euclid Bev., 149 F.3d

4  626, 631 (7th Cir. 1998), accord Dark, 451 F.3d at 1089.  Plaintiff

5  has not offered evidence indicating that any other position was

6  available.[14]

7      For these reasons, plaintiff has failed to raise a triable

8  question as to whether he could perform the essential functions of

9  the Maintenance Worker I position, with or without accommodation.

10  Plaintiff therefore was not a "qualified individual," and his ADA

11  and FEHA discrimination claims fail.

12  **B.   Plaintiff's "Reasonable Accommodation" Claims**

13      Plaintiff's third claim is for "Disability Discrimination

14  (Failure to Accommodate) in Violation of the Rehabilitation Act."

15  Plaintiff's fourth claim is for "Failure to Provide Reasonable

16  Accommodations" under FEHA.

17

18      [14] The court does not address defendant's alternative argument
that employers are not required to reassign probationary employees.

19  This argument is based on a prior regulation implementing the
Rehabilitation Act, which held that reassignment was available to

20  "nonprobationary employee[s]" who acquired a disability that
impaired their existing duties.  McLean v. Runyon, 222 F.3d 1150,

21  1154 (9th Cir. 2000) (quoting 29 C.F.R. § 1614.203(g) (2000)); see
also Kennelly v. Penn. Turnpike Comm'n, 208 F. Supp. 2d 504, 512

22  (E.D. Pa. 2002).  In 2002, 29 C.F.R. § 1614.203 was amended to
simply provide that the rehabilitation act uses the standards for

23  employment discrimination provided by the ADA.  The current
rehabilitation act and ADA regulations do not refer to probationary

24  or nonprobationary status in discussing reassignment.  While the
EEOC's interpretive guidance to the ADA's employment provisions

25  notes that "[r]eassignment is not available to applicants," 29 CFR
part 1630 Appendix, the parties have not addressed whether

26  probationary employees should be analogized to "applicants."

1    These claims substantially overlap plaintiff's first and

2  second claims.  The Rehabilitation Act explicitly provides that

3  "The standards used to determine whether this section has been

4  violated in a complaint alleging employment discrimination . . .

5  shall be the standards applied under [the ADA] as such sections

6  relate to employment."  29 U.S.C. § 794(d).[15]  The parties have not

7  identified any salient differences between the Rehabilitation Act,

8  FEHA, and the ADA with respect to the third and fourth claims.

9    "The elements of a failure to accommodate claim are (1) the

10  plaintiff has a disability under the FEHA, (2) the plaintiff is

11  qualified to perform the essential functions of the position, and

12  (3) the employer failed to reasonably accommodate the plaintiff's

13  disability."  Scotch v. Art Institute of California, 173 Cal. App.

14  4th 986, 1009-10 (2009) (citing Wilson v. County of Orange, 169

15  Cal. App. 4th 1185, 1192 (2009)).  For the reasons stated above,

16  plaintiff has not raised a triable question as to whether he is

17  qualified for the position or as to whether any reasonable

18  accommodation was available.  Defendant is therefore entitled to

19

20    [15] More generally, the Ninth Circuit has held that "[b]ecause
   the ADA was modeled on section 504 of the Rehabilitation Act,
21  'courts have applied the same analysis to claims brought under both
   statutes.'"  Boose v. Tri-County Metro. Transp. Dist. of Or.,
22  F.3d ___, 2009 U.S. App. LEXIS 25609 (9th Cir. Nov. 23, 2009)
   (quoting Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1045
23  n.11 (9th Cir. 1999)).  The Ninth Circuit has recently held that
   there are some differences between the scope of the ADA and the
24  Rehabilitation Act.  Fleming v. Yuma Reg'l Med. Ctr., ___ F.3d ___,
   2009 U.S. App. LEXIS 25406 (9th Cir. Nov. 19, 2009) (employment
25  discrimination claims under the rehabilitation act, unlike those
   under the ADA, do not require an employer/employee relationship).
26  However, nothing indicates that any such differences are pertinent
   here.

1    summary judgment on these claims.

2    **C.    Plaintiff's Claim for Failure to Engage in an Interactive**

3    **Process in Determining Reasonable Accommodations**

4         FEHA separately makes it an unlawful employment practice to

5    "fail to engage in a timely, good faith, interactive process with

6    the employee or applicant to determine effective reasonable

7    accommodations, if any, in response to a request for reasonable

8    accommodation by an employee or applicant with a known physical or

9    mental disability or known medical condition." Cal. Gov. Code §

10   12940(n).   This section provides an independent basis for

11   liability. Gelfo v. Lockheed Martin Corp., 140 Cal. App. 4th 34,

12   61 (2006) (citing Claudio v. Regents of the University of

13   California, 134 Cal. App. 4th 224, 243 (2005)).  To prevail on a

14   claim under this section, "an employee must identify a reasonable

15   accommodation that would have been available at the time the

16   interactive process should have occurred." Scotch v. Art Institute

17   of California, 173 Cal. App. 4th 986, 1018-1019 (2009).   The

18   employee may do so after the fact, in that the employee need not

19   have identified a specific accommodation at the time the

20   interactive process should have occurred.  However, "once the

21   parties have engaged in the litigation process" the employee bears

22   the burden of proof of showing "'a specific, available reasonable

23   accommodation.'" Id. (quoting Nadaf-Rahrov v. Neiman Marcus Group,

24   Inc., 166 Cal. App. 4th 952, 983 (2008)).

25        As explained above, plaintiff has failed to provide evidence

26   indicating that a reasonable accommodation existed.   Therefore,

1 even assuming that plaintiff adequately requested an accommodation,

2 Gelfo v. Lockheed Martin Corp., 140 Cal. App. 4th 34, 62 n.22

3 (2006), plaintiff's claim for failure to engage in the interactive

4 process fails.

5 **C.   Plaintiff's Claim for Harassment**

6 Plaintiff's sixth claim is for harassment under FEHA.  FEHA

7 explicitly prohibits harassment of employees on the basis of

8 disability.   Cal. Gov. Code § 12940(j)(1).   Harassment is

9 actionable when it creates a "hostile work environment," i.e., when

10 the harassing conduct is "severe enough or sufficiently pervasive

11 to alter the conditions of employment and create a work environment

12 that qualifies as hostile or abusive to employees because of their

13 [protected status]." Hughes v. Pair, 46 Cal. 4th 1035, 1043 (2009)

14 (quoting Miller v. Dep't of Corrections, 36 Cal. 4th 446, 462

15 (2005)) (discussing sexual harassment).

16 In opposing this motion, plaintiff argued that harassment

17 consisted of Healy's comments, on two occasions in response to

18 plaintiff's complaints of discrimination, that plaintiff was

19 "barking up the wrong tree" and that "if you're looking to save

20 your job as a career [sic] with the City, you're going about it the

21 wrong way."  Pl.'s Opp'n, 29.  Plaintiff does not point to any

22 evidence of additional comments.  These comments are not themselves

23 severe enough to create a hostile work environment.  C.f. Dee v.

24 Vintage Petroleum, Inc., 106 Cal. App. 4th 30, 36 (2003)

25 (summarizing cases holding that a single racial or ethnic slur or

26 act of sexual assault by a supervisor could constitute harassment).

1    Defendant further notes the distinction FEHA draws between

2    harassment and discrimination. Whereas the federal anti-

3    discrimination statutes treat harassment as a form of

4    discrimination, under FEHA, harassment and discrimination fall

5    under separate statutory prohibitions. Cal Gov. Code §§ 12940(a),

6    (j)(1). To give effect to this distinction, California courts have

7    distinguished harassing acts from discriminatory acts. Reno v.

8    Baird, 18 Cal. 4th 640, 645-46, 657 (1998); see also Roby v.

9    McKesson Corp., No. S149752, 2009 Cal. LEXIS 12374, *35 (Cal. Sup.

10   Court, Nov. 30, 2009). In general, "commonly necessary personnel

11   management actions such as hiring and firing, . . . promotion or

12   demotion, performance evaluations, the provision of support, . .

13   . do not come within the meaning of harassment." Reno, 18 Cal. 4th

14   at 646-47 (quoting Janken v. GM Hughes Electronics, 46 Cal. App.

15   4th 55, 63-65 (1996)); id. at 657. Thus, most of the other conduct

16   plaintiff complains of is not itself harassing behavior. See also

17   Cal. Code Regs. tit. 2, § 7287.6(b)(1)(A)-(C) (illustrating

18   harassment). Personnel actions are not categorically irrelevant

19   to harassment claims, because such actions may be evidence of

20   harassment consisting of a "hostile message" separate from the

21   action's official effect. Roby, 2009 Cal. LEXIS 12374, *37-41.

22   In this case, however, plaintiff has provided neither argument nor

23   evidence of such an effect.

24   **D.   Plaintiff's Retaliation Claim**

25       FEHA makes it unlawful to "discriminate against any person

26   because the person has opposed any practices forbidden under this

part or because the person has filed a complaint, testified, or
assisted in any proceeding under this part."  Cal. Gov. Code §
12940(h).  FEHA retaliation claims use the familiar <u>McDonnell</u>
<u>Douglas</u> burden shifting framework.  If a plaintiff establishes a
prima facie case for retaliation, the employer must offer a
legitimate, non-retaliatory reason for the action, after which the
plaintiff must provide evidence that the proffered reason was
pretext.  <u>Yanowitz v. L'Oreal USA, Inc.</u>, 36 Cal. 4th 1028, 1042
(2005).

     To show a prima facie case, plaintiff must show that he "(1)
. . . engaged in a 'protected activity,' (2) the employer subjected
the employee to an adverse employment action, and (3) a causal link
existed between the protected activity and the employer's action."
<u>Id.</u>  The October 12, 2006 memo complaining of discrimination was
protected activity.  Plaintiff contends that he suffered adverse
employment actions in the form of the negative performance
evaluation, the NOUs, the misstatement on the job characteristics
form, and his ultimate termination.  These actions differ in
salient ways.

     The misstatement on the job characteristics form and the
performance evaluation both occurred before plaintiff engaged in
protected conduct.  The job characteristics form was completed on
October 5th.  Langley tendered the full performance evaluation to
plaintiff on October 9th.  Plaintiff does not contend that he
complained of discrimination until October 12th, at which point he
raised concerns of discrimination both in his memo to City Hall and

1  at his meeting concerning the performance evaluation.  Preceding

2  acts could not have been retaliatory.

3       Plaintiff's termination plainly "materially affect[ed] the

4  terms and conditions of employment," and thus constituted an

5  adverse employment action.  Id. at 1052.  Both California courts

6  and the Ninth Circuit have held that "[c]lose proximity in time of

7  an adverse action to an employee's resistance or opposition to

8  unlawful conduct is often strong evidence of a retaliatory motive,"

9  and the court assumes that events in this case are close enough in

10 time to meet plaintiff's burden of showing a prima facie case.

11 Scotch v. Art Institute of Cal., 173 Cal. App. 4th 986, 1020 (2009)

12 (quoting Taylor v. City of Los Angeles Dept. of Water & Power, 144

13 Cal. App. 4th 1216, 1235 (2006)); see also Villiarimo v. Aloha

14 Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002).  However,

15 defendant has articulated a non-retaliatory reason for termination,

16 namely, plaintiff's failure to acquire a CDL.  The burden then

17 shifts back to the plaintiff to provide evidence that the proffered

18 reason was pretextual.  At this third stage, California courts have

19 held that mere timing is not itself sufficient.  Arteaga v.

20 Brink's, Inc., 163 Cal. App. 4th 327, 353 (2008); accord Scotch,

21 173 Ca. App. 4th at 1020.  While Artega held that temporal

22 proximity may be relevant if combined with other evidence of

23 pretext, plaintiff has offered no such evidence here.  Accordingly,

24 plaintiff's retaliation claim fails insofar as it is predicated on

25 plaintiff's termination.

26 ////

1    As to the NOUs, these were not adverse employment actions.[16]
2    Under FEHA, "adverse employment action" carries the same meaning
3    in the retaliation and employment contexts. Yanowitz, 36 Cal. 4th
4    at 1054.  An adverse employment action need not be an "ultimate
5    employment action[] such as termination or demotion," but it must
6    be material, i.e., "reasonably likely to adversely and materially
7    affect an employee's job performance or opportunity for advancement
8    in his or her career."  Id.  Yanowitz illustrated this requirement
9    by holding that the employee at issue raised a triable question
10   with evidence of "[m]onths of unwarranted and public criticism of
11   a previously honored employee, an implied threat of termination,
12   contacts with subordinates that only could have the effect of
13   undermining a manager's effectiveness, and new regulation of the
14   manner in which the manager oversaw her territory."  Id. at 1060.
15   These actions, when considered collectively, "placed [plaintiff's]
16   career in jeopardy," and the Court held that "[a]ctions that
17   threaten to derail an employee's career are objectively adverse."
18   Id.  The Court explicitly withheld judgment as to whether these
19   acts would constitute adverse employment actions if considered
20   individually.

21   In this case, plaintiff has not made any argument as to how,
22   in light of the fact that plaintiff was not qualified for his
23   position and was facing imminent termination for failure to acquire
24   a CDL, the NOUs "adversely and materially affect[ed] [his] job

---

26   [16] Defendant concedes that the NOUs were unrelated to, and not
     motivated by, plaintiff's failure to acquire a CDL.

1  performance or opportunity for advancement."  This is not to say
2  that an employee whose termination is forthcoming may never be
3  subject to an adverse employment action.  Although no such facts
4  are before the court, such an adverse employment action may consist
5  of a change in working conditions or duties prior to termination,
6  or of acts that negatively impact an employee's ability to secure
7  future employment. Nor does the court hold that the NOUs would not
8  raise a triable question as to an adverse employment action absent
9  impending termination for an unrelated reason.  In this case, the
10 six month deadline for obtaining a CDL had passed before plaintiff
11 engaged in protected conduct, and the decision to terminate
12 plaintiff was made one week after the first NOU was issued, and
13 before the second one was issued.  Plaintiff has not raised a
14 triable question as to whether the NOUs contributed to plaintiff's
15 termination, and plaintiff has not articulated any other theory as
16 to how these NOUs constituted adverse employment actions.

17                         **IV.  CONCLUSION**

18     For the reasons stated above, defendant's motion for summary
19 judgment (Doc. No. 28) is GRANTED.

20     IT IS SO ORDERED.

21     DATED:  December 11, 2009.

22

23

24                         LAWRENCE K. KARLTON
                           SENIOR JUDGE
25                         UNITED STATES DISTRICT COURT

26

                              34